Did I pronounce your client's name? Close, close. It's Faagai. Faagai. Well, okay. Well, good morning. May it please the Court. My name is Thomas Latake. I represent Defendant Jacob Del Mundo Faagai. I would submit to the Court that this is a fairly straightforward appeal in the sense that the facts are not really in dispute and the law is pretty well defined. The question is, as you know, in your de novo review, do you believe that the objective facts in this case support a fair probability that drugs would have been found in that vehicle at that particular time? And that's the key from the Rogers case that we relied upon heavily, the key being in that vehicle at that time, in that particularized place, not whether or not Mr. Faagai may have recently entered into a drug conspiracy, not whether or not he was associating with Mr. Penitentiary, who was a known drug dealer. But on that night, based on what the agents knew, did the objective facts support a finding that there was a fair probability that there would be drugs in that vehicle on that night? And so that's really what this appeal is about. When you look at the facts that the Court relied upon, our position is that that conclusion cannot be made. Cases like the Johnson case talks about how you cannot rely on hunches. We owe no deference to the District Court? Excuse me? Your position is that we owe no deference to the District Judge? When you look at the standard of review for denial of a motion to suppress, it is a de novo review. When you're looking at factual findings, you're looking for clear error.  It's not a credibility contest. It's not a matter of whether the agents were believable. Our position has always been you take what the agents say at face value and there's still not enough probable cause. So it's not really a factual dispute here. It's just a matter of applying the law to these facts, and the standard for this Court to do that is a de novo review. So what did the agents have? They've observed conversations that sound suspicious. So if you go through it. I think that's a fair characterization. Yes, absolutely. A couple of guys talking about meeting in the Costco parking lot. Right. Obviously in itself not enough probable cause, but certainly suspicious, right? Absolutely. And if context does matter, I would definitely agree to that. A week prior to the night. But that's not all there was, right? So there was these suspicious conversations. Right. Then they see them actually interacting in the 7-Eleven parking lot. Correct. And then he lies about where he came from. No dispute on that score. No dispute about that. But the important thing is, and as we did in our brief, the agents had a hunch that there was going to be a drug transaction taking place. Pretty good, huh? Well, they had a speculation and a hunch based off of conversations earlier in the day that said something about it. They were doing their jobs. They were. So they had a hunch that a drug transaction may be taking place. So they went and they observed it, as they should. The difference is, when they went to observe it, they didn't see anything further that would confirm that hunch to make it more than just a hunch. If you look at the Rogers case, it's very similar in the sense that what the court in Rogers said the officer was lacking. They saw him. Talking to the driver, that's all. So he's on the passenger side, the windows open, and he's halfway in or part of the way his head is in. I believe the record is that he was leaning on the window and talking to the driver. Okay. And they were talking for about half an hour. And, again, that, I would submit, weighs against a concept that a drug deal is taking place or confirmation of it because if you're doing a drug deal, you're not going to stay there for half an hour and talk to the guy. Mr. Otake, can I take you through a couple of facts to see what your take on them is? Sure. The conversation between Penitentiary and your client was, sorry, I've had, what do you say, I need the tools, right, the tools. Earlier in the day, yes. I'll bring the tools later. I've had some delay. And then your client says, I need the tools to do my work. Right. And then, undisputed, is Agent Lee saying tools means methamphetamine. I would, it's undisputed. Stay with me, stay with me, just a second. We're talking about the undisputed facts of what the agents say, right? That's undisputed that that's what Lee said. Now, if you see, if there's going to be a drug delivery, and you see your client leaning into the automobile of the deliverer, and you don't see anything on him, and he's arrived by car, where would a reasonable, suspicious agent think that the drugs were? But in your agent's, in your client's car. You have to go back to your initial statement that it's undisputed that tools means drugs. I will, it is clear that Agent Lee made that, had that hunch, made that leap, had that speculation that that's what it meant. But, and that's enough for him to go and investigate. But that doesn't mean that tools means drugs. That means that was in the agent's head. When he goes to watch. Let me ask you this. Were either Penitentiary or your agent in the construction business? My client was in the construction business, and I believe that. Where is the evidence that he was really looking for tools to work from Penitentiary? It's the government's burden to show that the automobile exception applies. And the government put forward no objective facts to show that there was anything more than a hunch on the part of the agents. Well, if there was a delivery of drugs, and your man didn't have them on him in the view of the agents, and he had arrived by car, and he'd been there for half an hour, isn't it reasonable to think that your man had put them in the car? That's why I was talking about the Rogers case. And what they said in the Rogers case, this court said in the Rogers case, is in that case they needed something more. They had an idea, but they needed something more. In the Rogers case, for example, they said they would have needed to have seen affirmative movements, or they would have needed to have seen the person trying to conceal something, or they would have needed to have seen in plain view something that resembled the identification that they later went to search for. And that's what our position is missing here. They had a hunch that a drug transaction was going to take place, but then there was nothing that they saw or heard to confirm that, to take that hunch into the realm of probable cause. Let's focus on the word tools, which seems to be sort of important here. Was there any evidence this was a term of art? For example, this is sort of way out of date, but as I recall a long time ago, maybe still the case that sometimes people refer to heroin as horse. There's no evidence. I don't know if that's still the case. So when people use a certain term, it sort of has a well-attributed meaning. Is there any evidence here that tools is that kind of term? No, there is not. The agents will say that there's obviously lingo and code words that people use in drug organizations, but not particularly. It is not a slang synonym, for example? No. Or at least there's no evidence of it. We have about two minutes left, a little bit less. Would you like to say that? I would. I would like to say that. One quick question. Your client is in the construction business? Yes. The fellow he was talking to, is he? I don't believe so. And there is no evidence in the record to suggest that he was. Thank you. Thank you. Aloha. Good morning. My name is Chris Allen Komowo-Thomas, Assistant U.S. Attorney for the United States. I think what's important here is what the defendant attempts to do in this case is to separate each event and isolate it and analyze it in an event by itself. But that's not the standard when you're trying to determine probable cause. Even if you add it all up, it doesn't amount to much. There are a couple of guys talking about suspicious sounding conversations, maybe, if you have a suspicious mind, and then they see nothing. They don't see a handoff. What did they have? Well, Your Honor, to put this into context, this involved an investigation that occurred over a four-month period. It began in July, wiretapped since August. This event occurred on November 5th, so it was near the end of that investigation. It sounds to me like you didn't come up with anything in four months. It sort of cuts against you. Well, Your Honor, just the day before, prior to this event, five pounds of methamphetamine was seized from Penatoni's courier. In his reply brief, they agree, they concede that Penatoni is the leader of a large-scale drug trafficking organization. They concede that. And now we have Penatoni associating with the defendant, but prior to even meeting with him. Are you suggesting guilt by association? No, Your Honor. Don't we have lots and lots of cases saying that just associating with people who commit crimes isn't, I remember writing an opinion like that 25 years ago. Well, you're exactly, that's exactly correct. But what we're saying is it gives context so that when we look at these isolated events, not by itself, but in the totality of the circumstances, then when they add up, it makes sense that it adds up to probable cause. Nothing at all. I mean, certainly not probable cause. Probable cause means more likely than not. Yes, Your Honor. More likely than not. Yes, Your Honor. You think that's what I'm asking? Well, let me give you an example. The first time they were meeting, before they set up that meeting, he was introduced by one of his primary associates, Julius Mitchell, the person during an investigation that was the collector of debt for Penatoni. We already laid the foundation during the motion to suppress that Julius Mitchell was the person who collected over $10,000 on two occasions as a debt for the 14 ounces of methamphetamine that was seized from Makusi Penatoni, Mr. Penatoni's distributor and cousin. We know already that Mitchell is involved in Penatoni's drug trafficking organization. We also observed Mitchell. I'm sorry. How do you know that? I mean, they had a conversation. How do you know that? I mean, drug dealers have conversations with people who are not involved in drug transactions. Yes, Your Honor. I mean, the fact that he was associated is just more guilt by association. Was there something about that transaction that suggested drug dealing? You're talking about the association between? The thing you were talking about. You said, you know, you want to go back and say, you know, he was introduced by this guy who? Yes, yes, Mitchell. So we know he's a drug distributor and a debt collector for Penatoni. He's the person that introduced the defendant to Penatoni. You're repeating yourself. That's why I asked my question. You've just repeated what you said earlier. I said drug dealers can have innocent conversations with people. The question is the fact that he was introduced by somebody who was involved in drug dealing doesn't in and of itself create any kind of suspicion. There has to be something about the introduction. There has to be something about the transaction that suggests suspicion. What was it about that transaction? Well, further, after that initial meeting. No, no, no. You were giving this as a first building block. Yeah, I'm talking about that, Your Honor. Because right after that meeting that Penatoni had. So I'm sorry, you're saying that introduction itself comes for nothing. No, I'm not saying that, Your Honor. I'm saying it does come for something. And the reason why is because. Mitchell, explain to me what does it count for? Even prior to meeting the person, Penatoni calls him. Before they meet, he calls the defendant and he says, are you coming by yourself? And the defendant replies, yes, automatic. Because he knew of Penatoni's concern. Penatoni is a leader of a drug trafficking organization. It's a risky business. He's concerned about who knows what he's doing. So he's confirming with the defendant, make sure you come by yourself. And the defendant already knows that's a concern. Because he says, yes, automatic. Not only that, once they have that meeting, Penatoni calls Julius Mitchell. And confirms, hey, is this guy trustworthy? Are you sure he's not going to do me wrong? And four hours after that meeting, the three meet again. Mitchell, Penatoni, Mitchell, and the defendant at Pearl Ridge. Now, the sequence of events is six days subsequent to that meeting. That's when Mitchell sends a text message to Penatoni. Hey, I'm going to Costco in Kapolei. I'm going to get some food. Do you want some food? Meet me there. So, you know, food, yeah, there's food at Kapolei. You said Mitchell sent the text. That's the guy sent the text. Yes, I'm sorry. Yes, Your Honor. Yes. Apologize. Defendant sent the text to Penatoni, meet me at Costco for food. So the sequence of events, in the agent's mind, and his last name is Z, Agent Z, he thinks, okay, that second meeting, based on what we've observed with Penatoni, there could have been the distribution of drugs. Because if they're meeting again in Kapolei six days later, that could be that the defendant is paying the money back for the drugs, which is why he determined the code word food. Now, right after that meeting, four hours after the meeting in Kapolei, and the government apologized because during the suppression hearing, all the people in that courtroom know that downtown Honolulu, where Penatoni resides, driving out to Kapolei, everybody in that meeting knows that that's about 24 miles, which is a far distance to travel to what? To shop for food? Well, if you go up and go to Costco, you know, it's worth the trip. Yeah, and he passed a Costco on the way. About a quarter of the way there, he passed a Costco. The guy is the one who uses the expression tools? Exactly. So after the food meeting? Yes or no? Yes, Your Honor. And in the agent's mind, that meant drugs? Yes, Your Honor. Had Penatoni or Mitchell or any of the other people involved in this sort of conspiracy used that expression before? No, Your Honor. That's the first time that we heard in this conspiracy the methamphetamine referred to as tools, but we also were aware that this is the first time that it was Penatoni and this defendant communicating about the methamphetamine. So that's, in terms of using tools, to the agent, it was out of context. Tools, but . . . Mr. Thomas, I think you answered incorrectly to the judge's question. He asked you if anyone besides the defendant used the word tools, and you said no. But Mr. Penatoni used the word tools and said, I'm bringing the tools, I'm late, right? Yes, between the two, yes. They were the only ones that used the word tools. It was the defendant who raised it,  And he also mentioned that he lost 10 large, which was based on his conversation to date meant that he lost $10,000. I think everyone knows what 10 large means. Yeah, and so, you know, what was peculiar about that conversation is that . . . Did the 10 large relate to something we know about in the real world? $10,000, Your Honor? Yeah. Yeah, well, you know, when the person of Mr. Penatoni's status, who's the leader of a drug trafficking organization . . . No, no, I'm sorry. Maybe you don't understand the question. Was it something we know that Penatoni lost $10,000 that we know he was referring to? Like had $10,000 worth of drugs been seized from him or something? No, the context in the text message . . . I'm sorry, you said no. Yes, it was because he mentioned to it that his girlfriend, because of his girlfriend, he lost 10,000 large. Right, but this isn't some reference to some known fact. Correct, but . . . Okay, I'm just asking. The reason why we raise it is because in a normal conversation, when somebody talks about losing $10,000, that would be a topic for discussion. But after Penatoni mentions it, it's not even talked about. I'm sorry. If they talk about it, it's suspicious. If they don't talk about it, it's suspicious, too. I just have a hard time understanding the difference between stuff that's suspicious and stuff that's not suspicious. No, it's unusual. What I'm saying is it's out of context and it's unusual, these conversations. And that's what alerts the agents. $10,000, you lose $10,000, you're not going to be able to talk about it? Thank you. You're out of time. Thank you, Your Honor. Our position is the Fourth Amendment can't be so watered down that if you have some unusual, suspicious conversations, you meet with somebody and talk with them for a while. What about that part where he says, is he reliable? That was a week earlier, right? That was the first time these two met, Penatoni and Fogeye. After that meeting where they just have dinner and the agents watch them eat dinner. And, you know, this thing about they're eating dinner alone. But it does sound like he checked him out a week earlier. And if you're just going to sort of give somebody some tools or go shopping with them at Costco and all that, you don't usually sort of check that person out as to, you know, whether he's reliable. And as we've said in our briefs, I mean, we concede that there is suspicious conversations and texts. We're not disputing that. But simply because a week earlier he said, is this guy trustworthy, doesn't mean a week later that we have a fair probability, a belief that there's a fair probability that we're going to find drugs in his car at that particular time, which is what the Rogers case stands for. You know, I just want to. I see. So your position is, I don't mean to put words in your mouth, I just want to make sure I understand, is they might very well have been right in thinking or have probable cause. You're shaking your head without hearing what I have to say.  I apologize. That they may well have had probable cause to think that drugs were being discussed, but not that there were drugs in the car at that moment in time. Is that your position? I would clarify that by saying not that they had probable cause, but I think we can say they had a hunch. Maybe that's a speculation that drugs were being discussed, but that hunch. It's a little more than that. I mean, you know, if you're going to check somebody out for being reliable and was there something about, you know, I got burned and so on, you know, that sounds pretty suspicious and possibly even to the level of probable cause. But I thought your point was they may well have been discussing drugs, but it just wasn't enough to put the drugs in the car at the time he was stopped. That is definitely one of the things we emphasize in our brief is at most they had a reason to believe that my client may have joined this drug trafficking organization the last week. That in and of itself then doesn't transfer to having probable cause to search that vehicle on that night at that particular time, and that's what the Rogers test. Why don't you accept for purposes of this question that, in fact, there is. We look at it and we conclude there is probable cause to believe that we're talking about drugs. So the police, we're just sort of going to accept that. I don't know what our colleagues think. I'm just saying let's say we get to conference and that's what our thinking is on this. So if they know they're discussing drugs, so they have that as a given, why doesn't that then, coupled with the other suspicious things that were going on, so the switch from jack-in-the-box to 7-Eleven, the lie about where he came from when he got stopped, why doesn't that, coupled with those other suspicious things, amount to probable cause to think there was, in fact, drugs in the car? Because like the Rogers case and other cases say, you need specific, articulable, objective facts that what you're searching for will be in that location at that time. And just because somebody may be part of it. So you think if you don't see a handoff or something that looks like a handoff, you don't have probable cause? Is that basically your position? No matter how suspicious. We're not going that far, but we're saying in this case you need something more than what they had. They had a hunch that there may have been a drug transaction going on, but there was nothing further to confirm it to raise the hunch to probable cause where they could go and search the vehicle. Okay. That's our position. Thank you. Thank you.
judges: Kozinski, Hawkins, Bea